## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

### ORLANDO DIVISION

### CASE NO. 6:22-CV-00820-WWB-DCI

**SECURITIES AND EXCHANGE COMMISSION,**

        **Plaintiff,**

**v.**

**SYNERGY SETTLEMENT SERVICES, INC.,**
**FOUNDATION FOR THOSE WITH SPECIAL**
**NEEDS INC.,**
**SPECIAL NEEDS LAW FIRM PLLC,**
**JASON D. LAZARUS, and**
**ANTHONY F. PRIETO, JR.**

        **Defendants.**

_____/

### <u>AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff Securities and Exchange Commission alleges:

### I. <u>INTRODUCTION</u>

1.    The Commission brings this action to enjoin the Defendants' fraudulent operation of two purportedly charitable pooled investment trusts with $46 million in assets and more than 380 trust members, most of whom are disabled recipients of Medicaid or Social Security Supplemental Security Income ("SSI") benefits.

2.    Section 1917 of the Social Security Act, 42 U.S.C. § 1396p, allows

Medicaid and SSI recipients to remain eligible for benefits despite receiving assets (such as awards or settlements in personal injury lawsuits) that would otherwise disqualify them from receiving that government assistance, as long as they place those assets in an irrevocable trust established and managed by a non-profit association.

3.      From no later than May 2015 through the present, the Defendants have marketed, sold investments in, and operated two pooled investment trusts purportedly established and managed by a non-profit entity as required by Section 1396p.  In reality, however, the entity named as the trustee of the two trusts, Defendant Foundation for Those with Special Needs, Inc., ("Foundation") is a shell corporation with no operations or employees.

4.      Defendants Synergy Settlement Services, Inc. ("Synergy"), Jason D. Lazarus, and Anthony F. Prieto, Jr. have installed the Foundation as a nominee trustee to attempt to hide the fact that Synergy, a for-profit corporation, Lazarus and Prieto perform all the trustee functions and profit from the trusts' operations by collecting all fees and other funds stemming from operating the trusts.

5.      The Defendants' operation of the pooled trusts has violated the antifraud and registration provisions of the federal securities laws in several ways.  First, Synergy, Lazarus, Prieto, and Defendant Special Needs Law

2

Firm, PLLC ("the Law Firm") have misrepresented to potential trust beneficiaries that they would be joining a trust managed by a non-profit association under Section 1396p, and therefore would remain eligible for Medicaid and SSI benefits.  To the contrary, because Synergy, Lazarus, and Prieto operated and managed the trusts for their own profit, they created a situation where the trust funds could count as beneficiaries' assets and jeopardize their Medicaid and SSI benefits.

6.     Synergy, Lazarus, and Prieto have lied about the for-profit operation and management of the trusts to beneficiaries, the Internal Revenue Service, and the Social Security Administration ("SSA"), through emails, firm brochures, marketing materials, trust documents and operating agreements, among other documents.

7.     In addition, Synergy, Lazarus, and Prieto improperly diverted all trustee fees, which come directly from beneficiaries' accounts, to Synergy. These Defendants also improperly used funds from deceased beneficiaries' accounts to reimburse themselves for employee salaries and other expenses, as well as to make donations to trial lawyers' and other organizations that violated their representations to the IRS and beneficiaries that they would only use such funds to further the trusts' mission to help the disabled.

8.     Synergy, Lazarus, and Prieto have also misled beneficiaries with

respect to the investment of the pooled trusts' assets. From 2015 to 2017, the Defendants did not tell beneficiaries they were investing their money in a certain class of mutual fund that doubled the fees the Defendants told the beneficiaries they were paying.

9.      The trusts are invested in securities, and the trust instruments are securities the Defendants are offering and selling to beneficiaries. Because the trusts are not operated and managed by a non-profit association, they do not qualify for exemptions from registration available to charitable organizations under the securities laws, and the Defendants have violated the registration requirements by offering and selling investments in the trusts without registering the offerings with the Commission.

10.      As a result of this conduct, the Defendants have violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a); Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; and/or Sections 206(1), 206(2) and 206(4) and Rule 206(4)-8 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6(1), (2), (4) and 17 C.F.R. § 275.206(4)-8.

11.      The Commission requests that the Court enter orders: (i) permanently restraining and enjoining the Defendants from violating these

provisions of the federal securities laws; (ii) directing the Defendants to pay disgorgement with prejudgment interest; and (iii) directing Synergy, the Law Firm, Lazarus and Prieto to pay civil money penalties.

## II.  DEFENDANTS AND OTHER RELEVANT ENTITIES

### A.  Defendants

12.     **Synergy** is a Florida for-profit corporation with its principal place of business in Orlando, Florida.

13.     **Foundation** is a Florida non-profit 501(c)(3) private foundation with its principal place of business in Orlando, Florida.

14.     **The Law Firm** is a Florida professional limited liability corporation with its principal place of business in Orlando, Florida.

15.     **Lazarus**, age 52, of Orlando, Florida, is an attorney licensed to practice in the State of Florida.  Lazarus is the chief executive officer and largest shareholder of Synergy, sole owner of and practitioner at the Law Firm, and president and a director of the Foundation.

16.     **Prieto**, age 48, of Tampa, Florida, is a Certified Financial Planner and an investment adviser representative of an investment adviser registered with the Commission.  Prieto is president and a minority owner of Synergy, and a director of the Foundation.  Prieto was an officer of the Foundation until March 2017.

5

## B. <u>Other Relevant Entities</u>

17.    **Settlement Solutions National Pooled Trust ("SSNPT")** is a special needs pooled trust for disabled individuals that purports to preserve their Medicaid and SSI benefits pursuant to Section 1396p.  As of April 3, 2022, SSNPT had 316 beneficiaries and total assets of approximately $30.7 million. Since May 2015, Foundation has been the named trustee of SSNPT.

18.    **Settlement Management National Pooled Trust ("SMNPT")** is a pooled trust for personal injury victims, often minors and incompetents in lieu of guardianship proceedings.   Per its master trust agreement, "[t]he purpose of [SMNPT] is to provide a vehicle for investment management" for its beneficiaries.   The trustee may, in its discretion, place beneficiaries in a Section 1396p trust to qualify for Medicaid or SSI.  As of April 3, 2022, SMNPT had 65 beneficiaries and total assets of approximately $15.5 million.   Since March 2016, Foundation has been the named trustee of SMNPT.

## III.  <u>JURISDICTION AND VENUE</u>

19.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a); Sections 21(d), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a); and Sections 209 and 214 of the Advisers Act, 15 U.S.C. §§ 80b-9 and 80b-14.

20.    The Court has personal jurisdiction over the Defendants and venue is proper in this District because, among other things, the Defendants reside and transact business in this District.  They also participated in the offer, purchase, or sale of securities in this District, and many of their acts and transactions constituting the violations alleged in this Complaint occurred in this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Commission's claims occurred here.

21.    In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV.  <u>FACTUAL ALLEGATIONS</u>

### A.  <u>Special Needs Pooled Trusts</u>

22.    Virtually all of the SSNPT or SMNPT beneficiaries are disabled or incompetent individuals or minors who have received awards or settlements in personal injury lawsuits.  Section 1396p permits Medicaid and SSI recipients to retain their benefits despite receiving assets from these awards or settlements that would otherwise place them above the income eligibility limits

7

for the government assistance.

23.    To retain eligibility for benefits under Section 1396p, the beneficiaries must place the assets they receive in an irrevocable pooled trust established and managed by a non-profit association.  The beneficiaries can then get approval from the trustee to use the assets for certain types of expenses governed by the statute to supplement their Medicaid or SSI benefits.

24.    Section 1396p expressly permits the assets of such trusts to be pooled for investment purposes, but the assets of each beneficiary must be held in a separate sub-account to be distributed by the trustee for the sole benefit of that beneficiary.

25.    Upon the beneficiary's death, the trusts may retain the sub-account balance ("retained funds") depending on the requirements of state law, whether the beneficiaries have designated remainder beneficiaries, and the language of the trust documents.  Trusts that keep retained funds must use them in keeping with the representations in trust documents and the legal obligations of special needs pooled trusts and their trustees.

26.    The SSA maintains a Program Operations Manual System ("POMS") with policy statements, guidelines for Section 1396p pooled trust operations, and interpretations of relevant laws.  The POMS allows non-profit trustees to use the services of other entities to help manage the trusts.

However, under the POMS "[i]f a non-profit association employs the services of a for-profit entity, the non-profit association must maintain ultimate managerial control over the trust . . . [T]he use of a for-profit entity must always be subordinate to the non-profit managers."

27.     The POMS identifies various forms of authority "that must vest in the non-profit association" (*i.e.*, cannot be delegated), including determining the amount of the trust corpus to invest and making the day-to-day decisions regarding the health and well-being of pooled trust beneficiaries.

## B.  The Foundation

28.     The Foundation was incorporated in Florida in February 2012**.**  Its officers and directors have all been principals or employees of Synergy, and it shares an address with Synergy.  Lazarus, the largest shareholder of Synergy and its CEO, is the president and a director of the Foundation.  Prieto, a minority shareholder and president of Synergy, is a director of the Foundation and was an officer until 2017.  The Foundation's three other currently listed officers and directors are owners or employees of Synergy.

29.     The Foundation's by-laws state that "the specific purposes for which the Corporation is formed is to assist personal injury victims with special needs, either directly or indirectly."  Its articles of incorporation list the identical purpose for which the Foundation was formed.  Furthermore, the

9

Foundation's articles of incorporation state that "the Corporation shall not allow any part of the net earnings of the Corporation to inure to the benefit or be distributable to any private person, member, director or officer of the Corporation . . ."

30.     Shortly after its incorporation, in August 2012, the Foundation applied to the IRS for non-profit, tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.  Lazarus signed the application as director and president of the Foundation.  In the section of the application entitled "Narrative Description of Your Activities" the Foundation reiterated:

> The specific purpose for which the Foundation was formed is to provide: (i) personal injury victims with special needs, through individual grants, supplemental assistance needed to obtain the care and services necessary for recovery/rehabilitation/education, helping to alleviate financial difficulties and (ii) funding of 501(c)(3) non-profit organizations operating specifically in the areas of providing personal injury victims with special needs, assistance to obtain the care and services necessary for recovery/rehabilitation/education.

31.     The application further described what organizations the Foundation would donate money to and the process by which the corporation would decide on its donations:

> Foundation Directors will research potential recipients, the personal injury suffered and the special needs of each.

> The Foundation plans to provide recipients with supplemental assistance to obtain the care and services necessary for recovery/rehabilitation/education helping to alleviate financial difficulties.

> Foundation Directors will research potential recipient 501(c)(3) non-profit organizations operating specifically in the areas of providing personal injury

victims with special needs, assistance to obtain the care and services necessary for recovery/rehabilitation/education . . . .

The Foundation will be providing assistance to (i) personal injury victims with special needs and (ii) 501(c)(3) non-profit organizations operating specifically in the areas of providing personal injury victims with special needs, assistance to obtain the care and services necessary for recovery/rehabilitation/education.

32.    The application also stated that the Foundation: (i) had no arrangements with related entities; (ii) followed a conflict-of-interest policy, including consideration of alternative service providers; and (iii) had no revenue-sharing joint ventures.

33.    Based on these representations, the IRS granted the Foundation 501(c)(3) status, a decision the SSA relied on in accepting the Foundation as a valid non-profit association that purportedly operated and managed SSNPT under Section 1396p.  During the SSA's review of SSNPT's master trust agreement in 2016, Synergy represented that SSNPT operated in accordance with the terms of the agreement – that the Foundation was a legitimate 501(c)(3) entity and managed SSNPT as trustee.

34.    Foundation became the SSNPT trustee in 2015.  On May 15, 2015, Prieto signed the master trust agreement for SSNPT on behalf of the Foundation as the named trustee.  Prieto signed subsequent amendments to the SSNPT master trust agreement in March 2016 and December 2016 on behalf of the Foundation.  Similarly, on March 16, 2016, Prieto signed the master trust agreement for SMNPT on behalf of the Foundation as the named

trustee.

35.     Both the SSNPT and SMNPT master trust agreements represented that the Foundation was the trustee and is a "501(c)(3) non-profit corporation," and that the pooled trust property "is to be administered and distributed by" the Foundation.

### C.  Marketing, Selling, And Operating The Trusts

36.     Synergy is a for-profit company that offers a host of structured financial products, including SSNPT and SNMPT.  Synergy's main source of business is personal injury trial lawyers whose clients frequently are disabled, minors, and/or have guardians, and who receive funds from personal injury and other legal proceedings.  Synergy, largely through Lazarus and The Law Firm, aggressively markets SSNPT and SNMPT to these lawyers.

37.     To that end, Synergy, Lazarus, and the Law Firm send a variety of marketing and other documents containing information about the Foundation and the trusts.  Among these documents are a joinder agreement that each beneficiary enrolling in a trust must sign, in which they acknowledge and adopt the trust's master trust agreement and agree that they are placing assets irrevocably into the trust they are joining.  There are also marketing brochures describing the benefits of joining a trust (i.e., retaining Medicaid and SSI benefits), uses of and limitations on the trusts (such as how and for what

types of expenses beneficiaries can receive distributions); what happens to any remaining funds in the trusts upon the death of a beneficiary; and purported options for investing funds in the trusts.

38.    When recruiting new beneficiaries for SSNPT and SMNPT, Lazarus cross-sells the legal services of the Law Firm to represent the beneficiaries in joining the trusts.  The Law Firm charges each client $1,500 for its services in helping them join SSNPT and SMNPT.   The Law Firm's invoice for the $1,500 fee describes the legal representation as "regarding establishment of pooled settlement trust," including "all consultations and communications regarding the Trust [and] preparation and drafting of the Trust."

39.    In 2015, Synergy signed an agreement with an unaffiliated for-profit firm, National Trust and Fiduciary Services Company, Inc., d/b/a Eastern Point Trust Company ("EPT") to act as the administrator for SSNPT and SMNPT.  In practice, Lazarus, Prieto, and Synergy delegated almost all authority over the trust administration to EPT.  EPT developed several model investment portfolios for beneficiaries and handled all aspects of investing trust assets in securities.  In addition, Lazarus, Prieto, and Synergy delegated the sole discretion to respond to and approve or deny distribution requests from beneficiaries.  EPT only conferred with Synergy (through Lazarus, Prieto, and

13

other Synergy employees) on a handful of distribution requests which, in EPT's judgment, required further consideration.

40.     In 2017, Synergy and EPT terminated their relationship.  Synergy then found another unaffiliated for-profit investment adviser, True Link Financial Advisors, LLC, to handle the investment and asset management functions for both SSNPT and SMNPT.  Since 2017, Synergy has controlled beneficiary distributions and other day-to-day decisions involving SSNPT and SMNPT, while True Link has handled the investment of trust assets.

41.     In addition to the $1,500 fee to the Law Firm, beneficiaries pay a $500 or $550 "joinder fee" (the amount has varied over time).  A portion of that fee has gone to either EPT or True Link, and the remainder has gone to Synergy, even though the Defendants represent that the Foundation charges the joinder fee.  Also as described in more detail below, beneficiaries have paid an annual trustee fee of either one percent (when EPT was the administrator) or .75 percent (when True Link was the administrator) of the value of the assets in their sub-account.  The administrator deducts the fee directly from each sub-account and sends it to Synergy.  From 2015 through 2019, Synergy earned in excess of $675,000 from trustee fees, and has earned more since then.  Synergy has earned more than $100,000 from the joinder fee.

42.     The Defendants offer and sell the pooled trusts to beneficiaries as

14

investment contracts.  Beneficiaries are provided membership in the trusts in exchange for them transferring funds from their monetary settlements or awards irrevocably into the trusts.  As allowed under Section 1396p, the trusts pool investor funds together for investment purposes.  The success of the investments depends on the efforts of the Defendants and their chosen investment advisers.  Once they join the trusts and select an investment model developed by the Defendants and their investment advisers, the beneficiaries have no involvement in the investment of their funds.

43.   Although beneficiaries have sought to join SSNPT in part to preserve their Medicaid and SSI benefits, the Defendants also market the trusts in brochures as "getting more than just protection of public benefits." They promise beneficiaries advantages "including high quality investment management services" and "better interest rates."  The Defendants also claim the trusts are superior to other pooled trusts because "the sub-accounts are actively managed by professional money managers," which "allows for a higher rate of return than would be possible if funds were invested separately . . . The sub-account funds, like other investments . . . may lose value.  There is no guarantee that the money will grow or be secure."  Lawyers for potential beneficiaries have frequently asked Lazarus and Prieto how the funds will be invested or if they will earn interest.

44.     No registration statement has been in effect for the pooled trusts during the time of the events set forth in this Complaint.  Furthermore, no exemptions from registration are available, including exemptions for charitable organizations under the Securities Act, the Exchange Act, the Advisers Act, and the Investment Company Act.

### D.  The Defendants' Misrepresentations And Omissions

#### 1.  The Defendants Misrepresent That The Foundation Manages The Trusts

45.     Lazarus, Prieto, and Synergy, in marketing materials, trust documents, emails, letters, websites, and elsewhere, repeatedly have stated to potential beneficiaries they should join SSNPT because it is a Section 1396p trust established and managed by a non-profit association - the Foundation.

46.     For example, in November 2015, Lazarus gave a presentation touting "How is the SSNPT different from other pooled trusts?" with such details as "Foundation…is Non-Profit Trustee" and "Lowest fees nationally" of just $550 at inception and "Annual trustee fee – 1% of assets held in trust" (emphasis in original).

47.     In another example, Lazarus directed a March 2018 Synergy blog post stating a pooled settlement trust "is managed by a non-profit entity who created it and acts as trustee.  As a result of this arrangement, it is a low-cost way for a client to set up a trust for their benefit. . . . The trustee of the SMNPT

16

is the Foundation for Those with Special Needs a 501(c)(3) non-profit created specifically to act as trustee for trusts such as this."

48.    In an email dated May 17, 2018, Lazarus told a prospective beneficiary: "I am not the trustee.  Under Federal Law, the trustee must be a non-profit.  In this case it is the Foundation."   Also, by email dated October 1, 2018, Lazarus told a prospective beneficiary that SSNPT "is administered by a non-profit called the Foundation."

49.    Prieto made similar statements.  On April 19, 2018, he presented a webinar stating special needs pooled trusts must be "managed by Not for Profit Trustee pursuant to federal law," with SSNPT and SMNPT identified as "available trust solutions."   By email dated August 23, 2018, Prieto told a representative of a prospective beneficiary "The Trustee [of SSNPT] is The Foundation for Those with Special Needs, Inc."

50.    Additionally, SSNPT's website has stated: "Under federal law, a pooled special needs trust must be created and managed by a non-profit trustee.  SSNPT is managed by [Foundation] who acts as the trustee. . . . While this is a difficult reality to face, turning your settlement over to a trustee of a special needs trust, it is what is required by federal/state law to remain eligible for needs based benefits."

51.    In their retainer letter, the Law Firm and Lazarus assure

17

beneficiaries that "[t]he creation of a pooled trust sub-account will insure that [their] settlement proceeds will not be treated as a countable asset for purposes of qualifying for Medicaid and/or SSI," and that the Law Firm would "adhere to proper and approved special needs trust structure and format." In an email dated April 11, 2017, Lazarus, in his capacity at the Law Firm, pressured the mother of a prospective beneficiary: "The purpose of the trust is [to] preserve Medicaid eligibility. Without the trust, your daughter would lose coverage. . . . Of course you can decide not to set up the trust and lose Medicaid until the money is completely gone."

52.     Finally, the Defendants consistently represent to beneficiaries that the trustee and joinder fees described above are paid to the Foundation as the trustee. For example, the Administrative Services Agreements that both EPT and True Link signed that included provisions for deducting and paying the trustee fees were with the Foundation, not Synergy. Additionally, a Welcome Kit that beneficiaries receive upon joining states that the trustee – the Foundation – charges the joinder and annual fees.

53.     All of these representations are false. The Foundation is a shell company with no employees, operations, or even a single email address. Rather, Lazarus and Prieto have Synergy employees perform all work in connection with SSNPT or SMNPT – or perform it themselves – without any

written agreements with the Foundation or invoices to the Foundation regarding any such work. Lazarus and Prieto respond to all inquiries from beneficiaries about trust operations. Other Synergy employees have answered calls from beneficiaries, as well as exchanged emails with True Link regarding investment of the trust assets.

54.     Synergy: induces beneficiaries to join the SSNPT and SMNPT based in part on promised investment performance; has had discussions with individual beneficiaries about investment options; and has the authority to invest each beneficiary's funds. Lazarus advises beneficiaries on acquiring interests in SSNPT and SMNPT. Prieto has advised some beneficiaries on investments, approved the portfolios by which SSNPT and SMNPT assets were invested, and primarily handled the reinvestment of SSNPT and SMNPT assets during the transition from EPT to True Link.

55.     Furthermore, the trustee fees purportedly paid to the Foundation under the Administrative Services Agreements are, in reality, paid directly to Synergy as part of its for-profit control of SSNPT and SMNPT. To attempt to justify receiving the trustee fees, Synergy entered into sham agreements with EPT and True Link pursuant to which each firm was supposed to pay a marketing fee to Synergy for purportedly marketing EPT or True Link's services. The alleged marketing fee in both cases has been equal to the trustee

fee under the Administrative Service Agreements.

56.    In reality, Synergy has done little or no marketing of either EPT or True Link's services.  For example, the only "marketing" Synergy has done for True Link is to mention in Synergy's brochures marketing the trusts to trial lawyers that True Link is the investment advisor, and to include True Link's own previously prepared firm descriptions in the brochures.  Furthermore, there is no separate marketing fee – both EPT and True Link paid only the trustee fee to Synergy.  The marketing agreement was merely a ruse to attempt to hide the fact that Synergy, not the Foundation, has received all trustee fees.

57.    Lazarus confirmed the bogus nature of the marketing fee by email dated June 4, 2014, telling an EPT representative that Synergy "would get the trustee fee at inception, which would be collected by [EPT] and then paid over to Synergy as some sort of marketing arm or something like that."  Synergy's internal strategic plans also tout the trustee fees as "significant recurring revenue" every year over the lifetime of the beneficiaries of SSNPT and SMNPT.

58.    To maintain the façade that SSNPT and SMNPT have a non-profit trustee, Lazarus and Prieto specifically told Synergy employees not to mention Synergy when marketing SSNPT and SMNPT.  Lazarus instructed a Synergy employee in a June 1, 2018 email: "Synergy is the marketing arm for the pooled

trusts but isn't involved corporately with the trusts (if that makes sense).  The only corporate entity related to the trusts is the Foundation."

59.    Five days later, Lazarus told True Link in an email to "make sure that we never reference Synergy on any of the pieces for the pooled trust. Synergy is the marketing arm for the trusts but that is it." In a February 6, 2018 email, Prieto told Lazarus that Synergy's name should be removed from account statements the trusts sent to SSNPT and SMNPT beneficiaries.

### 2.  The Defendants Make Misrepresentations About Pooled Trust Fees

60.    While EPT was trust administrator, the Defendants invested beneficiaries' funds in one of seven portfolios comprised of the same set of equity and fixed-income mutual funds (with varying percentages to reflect different risk tolerance levels), and a money market balance of 0 to 14 percent.

61.    All the mutual fund positions were in a particular class of mutual fund shares: Class C shares.  Class C shares carry the highest of certain kinds of fees payable to broker-dealers to cover fund distribution and shareholder service expenses known as 12b-1 Fees.  These recurring fees, which are included in a mutual fund's total annual fund operating expenses, are approximately one percent per year and are deducted from the mutual fund's assets on an ongoing basis.  As a result, 12b-1 Fees are paid by investors in Class C shares.

62.    Therefore, from 2015 to 2017, the beneficiaries of SSNPT and

21

SMNPT each year paid approximately one percent of their total assets in fees due to the Defendants investing their funds in Class C shares. At the time, EPT wholly owned a registered broker-dealer that collected 12b-1 Fees on the Class C share holdings and sent them (net of expenses) to EPT as its compensation for acting as trust administrator for SSNPT and SMNPT.

63.    Prieto and Lazarus knew EPT would be compensated for its role as administrator for the two trusts solely from 12b-1 Fees on Class C shares. In a May 19, 2014 email discussing EPT becoming trust administrator, EPT wrote that its proposal would allow for "lower public trustee fees" by using the fees from their proposed investment portfolios (all of which were comprised of Class C shares) as compensation to EPT. Furthermore, on January 10, 2017, Prieto acknowledged EPT was being paid through 12b-1 Fees: "[EPT] is earning roughly 1% from the funds they use. . . . The end client is not seeing the fee it is [embedded] into the expense of the funds."

64.    Lazarus, Prieto, and Synergy did not disclose to beneficiaries that they were, in effect, paying the 12b-1 Fees to EPT. In June 2015, the Defendants reviewed and approved a notice sent to beneficiaries stating "some of the many resulting benefits of [EPT] being the administrator are cost reductions for annual fees and a wider array of investment options. The annual fee will drop from 2% down to 1%." Thus, the Defendants only told the

beneficiaries they were paying a trustee fee of one percent and a $500 joinder fee – with no mention of the additional one percent 12b-1 Fees.  Nor did the Defendants provide beneficiaries with prospectuses for the mutual funds or other fee or class-specific disclosures.

### 3.  The Defendants Misrepresent Their Use of Retained Funds

65.     Section 1396p refers indirectly to funds in a beneficiary's sub-account being "retained by the trust" upon the death of a beneficiary, but is silent on the circumstances under which a pooled trust may retain those funds and the uses to which the trust may put those retained funds.  However, Internal Revenue Code Section 501(c)(3) specifies that non-profits granted tax-exempt status must generally use their funds for charitable purposes or the express purposes for which the entity was created.

66.     As noted above, in its 501(c)(3) application, the Foundation expressly represented to the IRS on multiple occasions that its specific purpose is to assist personal injury victims with special needs, and that it would fund "non-profit organizations operating specifically in the areas of providing personal injury victims with special needs."  Both the Foundation's by-laws and articles of incorporation contain similar descriptions of its purpose.

67.     In addition, Synergy, Lazarus, and Prieto have represented in numerous documents sent to actual and prospective beneficiaries that they

would use a beneficiary's retained funds expressly to further the trusts' mission of serving people with disabilities.  For example, the joinder agreements beneficiaries sign to join the trusts allow beneficiaries to choose among several options of what will happen to any funds still in their sub-accounts when they die.  Among the options is allowing the trust to retain the funds, in which case the joinder agreement states the trust will use the funds "to help the Settlement Solutions National Pooled Trust with its important non-profit mission of serving individuals with disabilities."

68.    Similarly, letters Lazarus writes to lawyers for beneficiaries considering joining one of the trusts attach a client intake form, which includes several options for funds remaining in a sub-account.  The "retained funds option" states: "if money is left in the sub-account when the trust Beneficiary passes away then the funds shall be retained by the Trust to help the Settlement Solutions National Pooled Trust with its important non-profit mission of serving individuals with disabilities."

69.    The Welcome Kit the Defendants send to new beneficiaries includes a "Schedule C – Authorized Representative and Remainder Beneficiary Designation."  The "Retained By Trust" option has identical language to the client intake form attached to Lazarus' letters.

70.    Lazarus sent an email to colleagues at Synergy on May 18, 2016,

24

attaching a proposed marketing brochure to send to trial lawyers. The brochure states in relevant part that "SSNPT was created for the singular purpose of assisting injury victims to remain eligible for needs-based public assistance benefits," and "our trust makes it possible for remaining assets to be returned to the family at death in certain situations, or remain in the trust for the benefit of other persons with disabilities."

71.   Although a one-page information sheet about both SSNPT and SNMPT the Defendants sent to some potential beneficiaries states that the Foundation was created both to assist people with disabilities and to give back to the civil justice system, this representation directly contradicts statements in the Foundation's 501(c)(3) application, articles of incorporation, by-laws, and numerous other trust documents the Defendants sent to beneficiaries.

72.   Contrary to their representations, Lazarus, Prieto, and Synergy have not used a significant portion of retained funds to help the disabled or other people with special needs. Instead, Synergy has diverted all of the funds from the SSNPT operating account to a separate bank account in the name of the Foundation, from where Lazarus and Prieto have used funds largely to further their own, for-profit interests.

73.   Since August 2018, Synergy has used at least $132,000 to pay trust administrative expenses, when it already collected the one percent trustee fee

purportedly to pay those same expenses.   Synergy financial statements indicate that since 2015 the annual trustee fee has exceeded the trusts' administrative expenses – leaving no need for use of retained funds to pay those expenses.  Synergy's use of retained funds to purportedly cover expenses, while also collecting the one percent trustee fee, did not reduce the amounts charged to beneficiaries for administrative costs.

74.   The Defendants also used retained funds to pay administrative expenses that had nothing to do with the trusts.   For example, they used retained funds to pay the premiums on a *Synergy* business insurance policy.

75.   In addition, Synergy has spent at least $300,000 on donations to trial lawyers' organizations or charities of which the Defendants are a member or have friends and acquaintances who serve in important positions in them that have nothing to do with assisting disabled persons.  Some organizations were not even 501(c)(3) non-profits.  Numerous emails among Lazarus, Prieto and their Synergy partners make it clear that the main criteria for choosing recipients of the beneficiaries' retained funds was to promote Synergy's for-profit business interests.   Among the recipients of Synergy's largesse with retained funds have been golf tournaments, beach parties, and a holiday party organized by legal friends, clients, and acquaintances of Lazarus and his Synergy partners.

76.     Lazarus and Prieto have confirmed the purpose of these disbursements of retained funds in internal emails.  For example, Lazarus wrote in a December 10, 2015 email that Synergy should sponsor an event at the request of a fellow lawyer because "this is targeted to the legal community so it does give us good bang for the buck."  In another instance, Prieto agreed to contribute $1,000 to a golf tournament organized by a lawyer who another Synergy lawyer described as "my best client" who had recently arranged for money to be spent on Synergy financial products.

77.     Other examples include:

a.  In June 2015, Synergy used retained funds to pay $15,000 to a group of trial lawyers who had achieved large settlements.  In March 2015, Lazarus had sent the group's founder, a client of Lazarus, a proposal for an "exclusive annual sponsorship" by which Synergy could attend group social events, provide webinars, and be recognized as a sponsor in membership emails and "business partner" on the group's website. Soon after Synergy's $15,000 payment, in November 2015, Prieto prepared a presentation for Lazarus to make to that group about all of Synergy's lines of business titled "Synergy Settlement Services: Allowing Trial Lawyers to Focus on What They Do Best."

b.  In January 2016, Synergy used retained funds to pay the professional

27

dues for Synergy employees to be named as sponsoring fellows of a think tank created by trial lawyers.

c. From 2015 through 2018, Synergy used retained funds to pay for a named sponsorship at a holiday event for the lawyer alumni group of a private high school in Tampa.  Synergy made the payments at the request of a lawyer who frequently refers business to Synergy.

d. In June 2015, June 2016 and July 2017, Synergy used retained funds to pay for a named sponsorship at judicial luncheons hosted by a legal mentoring organization for worker's compensation lawyers.

e. In August 2015, July 2016 and July 2017, Synergy used retained funds to pay for a named sponsorship at a beach party held by a trial lawyer association unrelated to the disabled community.

f. In November 2015, Synergy sponsored a project involving a trial lawyer for construction activities in a Berber village in Morocco unrelated to the disabled community.

## V.  VIOLATIONS ALLEGED

### COUNT I

### Violations of Section 17(a)(1) of the Securities Act

### (Against All Defendants)

78.     The Commission repeats and realleges Paragraphs 1 through 77 of

28

its Complaint as if incorporated herein.

79.     From no later than May 2015 to the present, the Defendants, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or severely recklessly, employed any device, scheme or artifice to defraud.

80.     By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

## Violations of Section 17(a)(2) of the Securities Act

### (Against All Defendants)

81.     The Commission repeats and realleges Paragraphs 1 through 77 of its Complaint as if incorporated herein.

82.     From no later than May 2015 through the present, the Defendants, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under

which they were made, not misleading.

83.     By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT III

## Violations of Section 17(a)(3) of the Securities Act

### (Against All Defendants)

84.     The Commission repeats and realleges Paragraphs 1 through 77 of its Complaint as if incorporated herein.

85.     From no later than May 2015 through the present, the Defendants, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

86.     By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT IV

## Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act

### (Against All Defendants)

87.    The Commission repeats and realleges Paragraphs 1 through 77 of its Complaint as if incorporated herein.

88.    From no later than May 2015 through the present, the Defendants, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or severely recklessly employed any device, scheme or artifice to defraud in connection with the purchase or sale of any security.

89.    By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(a).

## COUNT V

## Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act

### (Against All Defendants)

90.    The Commission repeats and realleges Paragraphs 1 through 77 of its Complaint as if incorporated herein.

91.    From no later than May 2015 through the present, the Defendants, directly and indirectly, by use of any means or instrumentality of interstate

31

commerce, or of the mails, knowingly or severely recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security.

92.     By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b).

## <u>COUNT VI</u>

## <u>Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act</u>

## **(Against All Defendants)**

93.     The Commission repeats and realleges Paragraphs 1 through 77 of its Complaint as if incorporated herein.

94.     From no later than May 2015 through the present, the Defendants, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or severely recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of any security.

95.     By reason of the foregoing, the Defendants violated, and, unless

enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(c).

## COUNT VII

### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against Synergy, Lazarus, Prieto, and The Foundation)

96.     The Commission repeats and realleges Paragraphs 1 through 64 of its Complaint as if incorporated herein.

97.     From no later than May 2015 through the present, Synergy, Lazarus, Prieto, and the Foundation, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, when no registration statement was in effect with the Commission as to such securities, and have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities when no registration statement had been filed with the Commission as to such securities.

98.     There were no applicable exemptions from registration.

99.     By reason of the foregoing, Synergy, Lazarus, Prieto, and the Foundation violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a), (c).

## COUNT VIII

## Violations of Section 206(1) of the Advisers Act

## (Against Synergy, Lazarus, and Prieto)

100.    The Commission repeats and realleges Paragraphs 1 through 77 of its Complaint as if incorporated herein.

101.    From no later than May 2015 through the present, Synergy, Lazarus and Prieto, by engaging in the conduct set forth above, directly or indirectly, knowingly or severely recklessly, through use of the mails or the means or instrumentalities of interstate commerce, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities, employed devices, schemes, or artifices to defraud.

102.    By reason of the foregoing, Synergy, Lazarus and Prieto violated, and, unless enjoined, are reasonably likely to continue to violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

## COUNT IX

## Violations of Section 206(2) of the Advisers Act

## (Against Synergy, Lazarus, and Prieto)

103.    The Commission repeats and realleges Paragraphs 1 through 77 of its Complaint as if incorporated herein.

104.    From no later than May 2015 through the present, Synergy, Lazarus and Prieto, by engaging in the conduct set forth above, directly or indirectly, knowingly or severely recklessly, through use of the mails or the means or instrumentalities of interstate commerce, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities, engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

105.    By reason of the foregoing, Synergy, Lazarus and Prieto violated, and, unless enjoined, are reasonably likely to continue to violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## COUNT X

## Violations of Section 206(4) and Rule 206(4)-8 of the Advisers Act

### (Against Synergy, Lazarus, and Prieto)

106.    The Commission repeats and realleges Paragraphs 1 through 77 of its Complaint as if incorporated herein.

107.    From no later than May 2015 through the present, Synergy, Lazarus and Prieto each acted as investment advisers, as defined by Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), to SSNPT and SMNPT and their beneficiaries.

35

108.    At all relevant times, SSNPT and SMNPT operated as a pooled investment vehicle, as defined by Rule 206(4)-8(b) under the Advisers Act, 17 C.F.R. § 275.206(4)-8(b).

109.    Synergy, Lazarus and Prieto, by engaging in the acts and conduct alleged above, while acting as investment advisers to a pooled investment vehicle, by use of the means and instrumentalities of interstate commerce and of the mails, made untrue statements of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in SSNPT and SMNPT, and otherwise engaged in acts, practices or courses of business that were fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in SSNPT and SMNPT.

110.    By reason of the foregoing, Synergy, Lazarus and Prieto violated, and, unless enjoined, are reasonably likely to continue to violate, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

## VI.  RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

36

## A.

## **Permanent Injunction**

Issue a Permanent Injunction restraining and enjoining the Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

## B.

## **Disgorgement**

Issue an Order directing Synergy, Special Needs Law Firm, the Foundation, and Lazarus to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## C.

## **Penalties**

Issue an Order directing Synergy, Special Needs Law Firm, Lazarus and Prieto to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

**D.**

**Further Relief**

Grant such other and further relief as may be necessary and appropriate.

**E.**

**Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action and over the Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

**VII.  JURY TRIAL DEMAND**

The Commission demands a trial by jury on all issues so triable.

Dated: May 2, 2022          By:     s/Robert K. Levenson
                                   Robert K. Levenson
                                   Senior Trial Counsel
                                   Fla. Bar No. 0089771
                                   Telephone: (305) 982-6341
                                   Facsimile: (305) 536-4154
                                   E-mail:  Levensonr@sec.gov

                                   Alice Sum
                                   Trial Counsel
                                   Fla. Bar No. 354510
                                   Telephone: (305) 416-6293
                                   Facsimile: (305) 536-4154

38

E-mail:  SumAl@sec.gov

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131